**No. 21-1052**

# In the United States Court of Appeals for the Seventh Circuit

**Lisa Marie Montgomery,**
**Petitioner-Appellee**

**v.**

**T.J. Watson, Warden,**
**Michael Carvajal, and**
**Jeffrey Rosen,**
**Respondents-Appellants**

On Appeal from the United States District Court for the Southern District of Indiana,
D. Ct. No. 2:21-cv-00020-JPH-DLP
(Hon. James Patrick Hanlon)
**(Capital Case)**

## EMERGENCY MOTION TO VACATE DISTRICT COURT'S ORDER STAYING MONTGOMERY'S EXECUTION

JOHN CHILDRESS
Acting United States Attorney
Southern District of Indiana

J. BENTON HURST
BRIAN P. CASEY
Special Assistant United States Attorneys
400 East 9th Street, Suite 5510
Kansas City, MO 64106
John.Hurst@usdoj.gov

## INTRODUCTION AND SUMMARY OF ARGUMENT

The government files this emergency motion to vacate the order entered by the district court on January 11, 2021, staying petitioner Lisa Marie Montgomery's execution. Because Montgomery's execution is scheduled for 5 p.m. central time today (January 12, 2021), the government respectfully requests that the Court rule on this motion as soon as possible, as the Acting Solicitor General intends, if necessary, to seek relief from the Supreme Court. The government further requests that the Court eliminate any doubt that any order it issues has immediate effect by issuing the mandate forthwith.[1]

Lisa Montgomery was sentenced to death in 2008. After post-conviction proceedings were completed, an execution date was announced on October 16, 2020. Within 12 days Montgomery had indicated she would challenge her competency to be executed under *Ford v. Wainwright*, 477 U.S. 399 (1986). But—tacitly conceding the weakness of her claim—she did not file her petition until the evening of Friday, January 8, 2021. She thereby sandbagged the government and the courts by undermining the government's ability to comprehensively demonstrate, at the last minute, that the hundreds of pages of materials she proffered with her petition do not make any

[1] Because of the timing of the district court's order, this motion could not be filed seven days before action is necessary. Last night, the government moved the district court to stay its order, but the district court has not yet ruled on that motion.

threshold showing of her incompetence under *Ford*. The district court erred by rewarding her egregious ploy to evade her lawful death sentence.

Montgomery's unreasonable and unnecessary delay in filing her claim alone provides a sufficient ground to deny or vacate the last-minute stay of execution. As the Supreme Court has made clear, "where a claim could have been brought at such as time as to allow consideration of the merits without requiring entry of a stay," there is a "strong equitable presumption that no stay should be granted." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 n.5 (2019) (citation and internal quotation marks omitted). Because Montgomery provides no legitimate basis for waiting until *less than four days* before her execution to file her petition, she cannot overcome that presumption.

In any event, Montgomery cannot establish a likelihood of success on her *Ford* claim. Her asserted lack of competence is based largely on evidence about her mental history developed during previous proceedings that did not address the relevant question under *Ford*: whether she is now "unable to rationally understand the reasons for [her] sentence." *Madison v. Alabama*, 139 S. Ct. 718, 727 (2019). And, although she offers three "expert" opinions about her current condition, each is based on unreliable hearsay that fails to connect any currently reported symptoms to the constitutional standard. In fact, Montgomery has made multiple statements during telephone calls with family members in recent weeks and months demonstrating that she understands her situation quite well and is hoping that one of her pending challenges will simply postpone her execution date until at least January 20.

## STATEMENT

1. In April 2004, Montgomery met Bobbie Jo Stinnett at a dog show. Stinnett maintained a website to promote her dog-breeding business, which she ran out of her home. In the spring of 2004, Stinnett became pregnant and shared that news with her online community, including Montgomery. Montgomery was herself unable to become pregnant because she had been sterilized years earlier. Nevertheless, around that time, she falsely began telling people that she was pregnant, including her second husband, who was unaware of her sterilization. *United States v. Montgomery*, 635 F.3d 1074, 1079-80 (8th Cir. 2011).

In December 2004, when Stinnett was eight months pregnant, Montgomery contacted her using an alias and feigned interest in purchasing a puppy. The women arranged to meet the following day. Montgomery drove from her home in Kansas to Stinnett's home in Missouri, carrying a cord and a sharp kitchen knife. After playing with the puppies for some time, Montgomery attacked Stinnett, using the cord to strangle her until she was unconscious. Montgomery then cut into Stinnett's abdomen with the knife, which caused Stinnett to regain consciousness. A struggle ensued, and Montgomery again strangled Stinnett with the cord, this time killing her. Montgomery extracted the baby from Stinnett's body, cut the umbilical cord, and left with the child. *Montgomery*, 635 F.3d at 1079-1080.

The next day, police found Montgomery sitting on her couch, holding the baby. Montgomery initially claimed that she had given birth at a clinic in Topeka, but later

admitted to that lie and told another one. She claimed that, unbeknownst to her husband, she had given birth at home with the help of two friends because the family was having financial problems. When asked for her friends' names, Montgomery said that they had not been physically present but had been available by phone if difficulties arose. Eventually, Montgomery confessed to killing Stinnett, removing the baby from her womb, and abducting the child. *Montgomery*, 635 F.3d at 1080.

2. In January 2005, a federal grand jury indicted Montgomery on one count of kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a)(1) (2000). Indictment 1, *United States v. Montgomery*, No. 05-cr-6002 (W.D. Mo.) (Jan. 12, 2005). After trial, the jury unanimously found Montgomery guilty and recommended a capital sentence. 635 F.3d at 1085. The district court sentenced Montgomery in accord with that recommendation. *Id.* The court of appeals affirmed, 635 F.3d 1074, and the Supreme Court denied certiorari, *Montgomery v. United States*, 565 U.S. 1263 (2012).

In 2012, Montgomery sought post-conviction relief under 28 U.S.C. § 2255. The district court denied relief and denied a certificate of appealability (COA). See Order, *Montgomery v. United States*, No. 12-8001 (W.D. Mo. Mar. 3, 2017); Order, *Montgomery*, No. 12-8001 (Dec. 21, 2015). The court of appeals denied a COA and dismissed Montgomery's appeal. Judgment, *Montgomery v. United States*, No. 17-1716 (8th Cir. Jan. 25, 2019). The Supreme Court again denied certiorari. *Montgomery v. United States,* 140 S. Ct. 2820 (2020).

3. On October 16, 2020, the Attorney General announced that Montgomery's execution had been scheduled for December 8, 2020. Dkt. 444, *United States v. Montgomery*, No. 05-cr-6002 (W.D. Mo.). Twelve days later, Montgomery told the District Court for the District of Columbia that she intended to challenge her competency to be executed. The suggestion prompted the United States Attorney for the Western District of Missouri to write Montgomery's current counsel, on November 13, 2020, to coordinate a fair and expeditious adjudication of any competency claim:

> On October 28, 2020, you filed a proposed complaint in the United States District Court for District of Columbia stating that, "Whether Mrs. Montgomery is psychiatrically competent to be executed is not at issue in this suit, but will be addressed in an appropriate forum pursuant to *Madison v. Alabama*, 139 S. Ct. 718 (2019)." As we are currently fewer than four weeks from her execution date, could you please advise whether a suit raising such a claim will be filed, and if so, in which judicial district the suit will be filed? My office will assist with the Government's [response] to such a claim, and this information will greatly aid with ensuring a prompt and orderly adjudication.

Dkt. 13-7, at 2. Montgomery's counsel never responded.

Montgomery subsequently filed two more suits in the District of Columbia, presenting additional arguments for delaying her execution, one of which resulted in a preliminary injunction to afford her counsel, who were suffering from COVID at the time, additional time to prepare a clemency petition. Under the injunction, the government was precluded from carrying out Montgomery's execution before December 31, 2020. *Montgomery v. Barr*, 20-CV-3261, 2020 WL6799140, at *11 (D.D.C. Nov. 19, 2020). On November 23, 2020, in compliance with that injunction, the BOP

Director designated January 12, 2021, as Montgomery's new execution date. Dkt. 445, *Montgomery*, 5:05-cr-6002 (W.D. Mo.).

Montgomery has used the intervening weeks to raise various regulatory and constitutional claims about the scheduling of her execution and her planned transfer to Terre Haute, in the Southern District of Indiana. *See, e.g.*, *Montgomery v. Barr*, No. 4:20-cv-1281, 2020 WL 7353711 (N.D. Tex. Dec. 15, 2020); *Montgomery v. Rosen*, No. 20-cv-3261, 2021 WL 75754 (D.D.C. Jan. 8, 2021); *United States v. Montgomery*, No. 05-cr-6002 (W.D. Mo. Jan. 10, 2021), Dkt. 451, *appeal pending*, No. 21-1074 (8th Cir. filed Jan. 11, 2021).

On January 7, 2021, Montgomery's counsel wrote government officials to request a delay of Montgomery's execution because they "have a legal and ethical obligation to evaluate Mrs. Montgomery's current mental state to determine the existence of any potential Eighth Amendment claims." Dkt. 13-10, at 2. The officials declined, explaining:

> We informed you almost two months ago when you first requested a delay of Ms. Montgomery's execution date that the Bureau of Prisons would facilitate remote communication to assist counsel and others (such as medical experts) with whatever access you desire. However, you have not made any requests for such access during this time. We will continue to accommodate requests moving forward.

Dkt. 13-11, at 2.

4. On the following evening of Friday, January 8, 2021, Montgomery filed this habeas petition under 28 U.S.C. § 2241. Dkt. 1. The district court ordered the

government to respond by 11:59 p.m. on Sunday, January 10, 2021. Dkt. 6. At 3:40 p.m. on Saturday, Montgomery filed a "corrected" petition for a writ of habeas corpus, including several appendices which had been omitted from the initial petition, followed by a motion to stay. Dkt. 11, 12.

Montgomery's petition asserts two related claims. First, she claims that carrying out her scheduled execution would violate the Eighth Amendment under *Ford v. Wainwright*, 477 U.S. 399 (1986), because as a result of mental illness, she lacks a rational understanding of the government's rationale for executing her. Second, she argues that it would violate due process to carry out the execution without permitting her attorneys and mental health experts to evaluate her competency face-to-face, which she claims they have been unable to do during the pandemic.

Late last night, the district court granted Montgomery's motion for a stay of execution, concluding that three affidavits submitted by Montgomery established the "substantial threshold showing of insanity" to warrant a competency hearing under *Ford*. Dkt. 17, at 15, 21. The court acknowledged that none of Montgomery's experts had observed or spoken to Montgomery in years and relied on Montgomery's counsel for reports of her current condition. But it reasoned that experts "may rely on the statements of laypeople" if other experts in their area of expertise would "customarily rely on" such statements. *Id.* at 17. The court excused Montgomery's delay in raising her *Ford* claim, reasoning that "the timing is not unreasonable" given Montgomery's current state, the history of this litigation, and "what's at stake." *Id.* at 20. The court

thus granted the motion and announced it would "set a time and date for the hearing . . . in due course." *Id.* at 21.

## ARGUMENT

This Court should vacate the district court's stay of Montgomery's execution. A capital prisoner seeking a stay of execution pending additional legal proceedings bears the burden of demonstrating: (1) she has a significant likelihood of success on the merits in the pending proceedings; (2) she will suffer irreparable harm if a stay is not granted; and (3) the balance of equities weighs in favor of a stay. *Lambert v. Buss*, 498 F.3d 446, 447 (7th Cir. 2007); *cf. United States v. Holland*, 1 F.3d 454, 456 (7th Cir. 1993). Although irreparable injury is generally taken as a given in capital cases, it is "not itself enough" to justify a stay, *Lee v. Watson*, No. 19-3399, 2019 WL 6718924, at *1 (7th Cir. Dec. 6, 2019) (unpublished); *see Williams v. Chrans*, 50 F.3d 1358, 1360 (7th Cir. 1995). Moreover, because the government has a "significant interest in enforcing its criminal judgments, there is a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Lambert*, 498 F.3d at 452 (citation omitted).

The district court erred in staying Montgomery's execution for two reasons. First, because Montgomery unreasonably and unnecessarily delayed in bringing her claims *for months* after the government set the date of her execution, ultimately filing just days in advance of the scheduled execution, she cannot establish that the balance of equites

favors a last-minute stay. Second, Montgomery cannot establish a likelihood of success on the merits.

## I. THE EQUITIES WEIGH HEAVILY AGAINST A STAY OF EXECUTION

Montgomery's has not overcome the "strong equitable presumption" against granting a stay in response to her last-minute claim. *Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 n.5 (2019) (quotation marks omitted). The Supreme Court has repeatedly emphasized that the public has a "powerful and legitimate interest in punishing the guilty," *Calderon v. Thompson*, 523 U.S. 538, 556 (1998) (citation omitted), and that "[b]oth the [government] and the victims of crime have an important interest in the timely enforcement of a [death] sentence," *Bucklew*, 139 S. Ct. at 1133 (quotation marks omitted). "Only with an assurance of real finality can the [government] execute its moral judgment in a case," and "[o]nly with real finality can the victims of crime move forward knowing the moral judgment will be carried out." *Calderon*, 523 U.S. at 556. "The proper role of courts is" thus to ensure that challenges to the execution of "lawfully issued sentences are resolved fairly and expeditiously," and to "police carefully against attempts to use such challenges as tools to interpose unjustified delay." *Bucklew*, 139 S. Ct. at 1134. Federal courts "can and should" reject "dilatory or speculative suits," *Hill v. McDonough*, 547 U.S. 573, 585 (2006), and ensure that "[l]ast-minute stays should be the extreme exception, not the norm," *Bucklew v*, 139 S. Ct. at 1134.

These principles apply equally to claims that may first arise as an execution nears. In *Dunn v. Ray*, 139 S. Ct. 661 (2019), for example, the Supreme Court vacated a stay because the death-row inmate waited until ten days before his execution date to challenge a restriction on having a spiritual advisor in the execution chamber itself, even though the date of the execution had been set nearly three months earlier. *See Bucklew*, 139 S. Ct. at 1134 n.5. And the Sixth Circuit has vacated a district court's stay when the inmate first raised his *Ford* claim eight days in advance of his execution—four days *sooner* than Montgomery brought hers. *See Bedford v. Bobby*, 645 F.3d 372, 376-77 (6th Cir. 2011).

As explained above, Montgomery was first notified of her impending execution date nearly three months ago. And the current execution date of January 12, 2021, was established on November 23, 2020, after the first date was delayed to permit her counsel additional time to file a clemency application on her behalf. Yet Montgomery inexplicably waited until after the Friday evening before her Tuesday execution to file her petition.

Montgomery has advanced no reason why she could not have filed her claims several weeks ago, when she was raising various other claims in other courts. The record shows that Montgomery has long planned to bring a *Ford* claim and government officials offered to "aid with ensuring a prompt and orderly adjudication" of such a claim. Dkt. 13-7, at 2. Rather than agree to an orderly resolution (or respond at all), however, Montgomery waited nearly two more months.

While purporting to be "mindful about the possibility of strategic litigation," the district court manufactured a reason for Montgomery's delay. In her petition, Montgomery asserts that individuals "*can* be at risk of deteriorations in their mental states" as an execution nears. Dkt. 11, at 85 (emphasis added). The district court speculates that Montgomery's condition may actually *have* deteriorated when, on January 1, 2021, the D.C. Circuit reversed another stay of execution and her January 12 execution date became "relatively set in stone." Dkt. 17, at 20. But nothing in Montgomery's petition or evidence supports that speculation.

To the contrary, the overwhelming majority of the proffered evidence is from her 2008 trial and her 2012 post-conviction litigation. *See, e.g.*, Dkt. 11, at 15 (trial testimony); *id.* at 21, 24, 43, 51, 63 (post-conviction testimony). And the three recent affidavits, on which the district court relied, heavily rely on the same outdated information and provide no indication that Montgomery has undergone any change in the last several days that might justify the 11th-hour claim. *See, e.g.*, Dkt. 11-12, at 40-41 (claiming that "Montgomery's context changed dramatically" when the execution date was initially set in October); *cf.* Dkt. 11-12, at 3-4 (noting that her attorneys have not visited Montgomery since November).[2]

[2] The district court found it "worth noting" that two of Montgomery's attorney's previously experienced serious COVID-19 symptoms. Dkt. 17, at 20. But Montgomery is represented by dozens of attorneys who have continued to litigate zealously on her behalf, and "courts across the country have declined to delay executions for pandemic-related reasons." *Hall v. Barr*, No. 20-cv-3184-TSC, 2020 WL 6743080, at *5 (D.D.C. Nov. 16, 2020) (citing examples), *aff'd*, 830 Fed. Appx. 8 (D.C. Cir. Nov. 19, 2020), *stay and petition for certiorari denied*, Nos. 20-688 and 20A100, 2020 WL 6798776 (U.S. Nov. 19, 2020).

Had Montgomery timely filed her claim, the parties could already have developed the facts and presented an opportunity to determine Montgomery's competency on a full, adversarial record and without a stay. Instead, she forced the district court (and this Court) to either (1) deny (or vacate) a stay, and thus effectively the claim, without the possibility of any meaningful factual development or (2) grant (or affirm) a stay and delay the execution of a lawful sentence based solely on allegations and expert declarations that rely on unreliable hearsay and cannot be tested.

The district court chose the latter course, concluding that neither the "possibility" of strategic litigation nor delay outweighs "the need for a stay" when "counsel has made a threshold showing" of incompetence. Dkt. 17, at 20. But there is no exception to equitable principles for last-minute *Ford* claims. And had Montgomery's counsel truly believed in the strength of their threshold showing, they would have brought this claim when there was still time for full adversarial testing. Their failure to do so speaks volumes and should have led the district court to deny her last-minute request. It provides ample ground for this Court to vacate the stay and permit the execution of her lawful (and repeatedly upheld) sentence for a vicious kidnapping and murder more than sixteen years ago.

## II. MONTGOMERY HAS NOT ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS

Even setting aside Montgomery's unreasonable and unnecessary delay, the district court erred in granting a stay of execution because Montgomery cannot establish

a likelihood of success on the merits. To justify a stay of execution, a prisoner must "make a '*strong* showing' of probable success on the merits." *Lee*, No. 19-3399, 2019 WL 6718924, at *1 (quoting *Nken*, 556 U.S. at 434) (emphasis added). That requirement is a demanding one—a court may not grant a stay even if it is based on a "significant possibility" of success or simply on a finding "that evaluating [the defendant]'s arguments will take more time." *Id.*

The district court reasoned that Montgomery demonstrated a likelihood of success on her claim that executing her without a competency hearing would violate due process. Because a prisoner "must have been judged competent to stand trial" "in order to have been convicted and sentenced," however, the government "may properly presume that [a prisoner] remains sane at the time sentence is to be carried out, and may require a substantial threshold showing of insanity merely to trigger the hearing process." *Ford v. Wainwright*, 477 U.S. 399, 425-26 (1986) (Powell, J., concurring). Before Montgomery is entitled to a hearing, she must first make a substantial threshold showing of incompetency—*i.e.*, that she is unable to "reach a rational understanding of the reason for his execution," *Madison v. Alabama*, 139 S. Ct. 718, 723 (2019) (quotation omitted). *See Panetti v. Quarterman*, 551 U.S. 930, 949 (2007). Contrary to the district court's reasoning, Montgomery's proffered declarations by experts who have not observed or interacted with Montgomery for *at least four years* cannot make that showing. For at least three reasons, each of those declarations should have been rejected.

*First*, the opinions do not comport with the applicable professional standards for assessing competency. As the district court recognized, the experts rely "on a combination of the relevant scientific literature, past direct observations of Ms. Montgomery, and descriptions of [her] current behavior relayed by her counsel." Dkt. 17, at 15. In other words, although each purports to opine on Montgomery's current competency, none has had any recent direct observation or communication with Montgomery. Indeed, neither Dr. Porterfield nor Dr. Wood have observed Montgomery since 2016. Dkt. 11-12, at 2, 34-35. And Dr. Kempke, whose opinion the court found "especially probative," Dkt. 17, at 17, last treated Montgomery *more than a decade ago* in 2010, and does not even allege to have received her medical records. Dkt. 16-1, at 1.

The district court concluded their opinions were nevertheless reliable on the ground that experts may "rely on any evidence" that other experts in their field "customarily rely on." Dkt. 17, at 17. But as Dr. Pietz explained (and Montgomery does not deny), while "it is appropriate and consistent with the specialty guidelines for forensic psychology for an evaluator to discuss with attorneys their concerns regarding their client's competency, *no professional evaluating competency* should rely solely on that information and historical clinical evaluations in making a determination as to current competency." Dkt. 13-3, at 4-5. Consequently, Dr. Pietz explained that Dr. Porterfield and Dr. Woods' opinions concerning Montgomery's current competency "do not appear to have been based on sufficient, current facts or data to conform to any known

professional standards for evaluating competency." *Id.* And although Montgomery submitted Dr. Kempke's declaration only after the government's district court submission, Dkt. 17, at 11 n.4, it suffers from the same flaws. The failure of Montgomery's proffered experts to reliably apply such generally accepted principles and methods is sufficient ground to disregard their opinions entirely. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).[3]

*Second*, the doctors' decision to rely primarily on second-hand reports for information about her current symptoms is only made worse when one considers the likely veracity of their sources: statements made by a condemned prisoner with a history of exceptional deception funneled through her own attorneys. This is double hearsay of the most unreliable form.

Montgomery's history of manipulation and deception is well-established. After undergoing a sterilization procedure in 1990, Montgomery falsely claimed to have had four more pregnancies. *Montgomery*, 635 F.3d at 1081. In carrying out the gruesome murder of Bobbie Jo Stinnett, Montgomery used an alias to contact Stinnett online and feign interest in purchasing a puppy. *Id.* at 1079. After the murder, Montgomery told her husband "that she had gone into labor while Christmas shopping and that she had

[3] The district court noted that Dr. Porterfield and Dr. Woods claim to have been prevented from conducting a current in-person evaluation of Montgomery due to the COVID-19 pandemic. Dkt. 17, at 11. But as Dr. Pietz explains, competency evaluations can and are being conducted remotely via videoconference, consistent with professional standards. Dkt. 13-3, at 3-4. Even if they reasonably could not travel, Montgomery's experts cannot possibly justify their decision to rely almost exclusively on hearsay, rather than interact directly with Montgomery via videoconference, the next-best option to an in-person meeting.

given birth at a women's clinic in Topeka." *Id.* at 1080. Then, after announcing the birth of "their daughter" to friends and family, she lied to the police by claiming to have given birth in her kitchen at home and "disposed of the placenta in a nearby creek." *Id.*

For their part, Montgomery's counsel have previously been "admonished" "for their improper and unprofessional conduct" in Montgomery's § 2255 proceedings. Order at 127-28, *Montgomery v. United States*, 12-cv-8001 (W.D. Mo. Mar. 3, 2017), Dkt. 212. Among other things, Judge Fenner pointed to "the inappropriate and false description of trial counsel's performance during *voir dire*," "the false accusation that [one of the government's experts] committed perjury," "the twisted interpretation of the record to accuse trial counsel of discrimination," and "the accusation that [two experts] presented false testimony without any support for that claim." *Id.* at 122-23. He concluded that "[h]abeas counsel in the instances cited acted with disregard for the personal and professional reputation of individuals involved in the handling of this case," and found "no excuse to ignore professional decorum and conduct one's self *without regard for anything other than one's cause*." *Id.* at 127-28 (emphasis added).

Opinions based on such facially unreliable information cannot support a substantial threshold showing of incompetency. *See, e.g.*, *Dallas & Mavis Forwarding Co., Inc. v. Stegal*, 659 F.2d 721, 722 (6th Cir. 1981); *see also Montgomery v. Barr*, No. 20-cv-3214, 2020 WL 6939808, at *7 (D.D.C. Nov. 25, 2020) (McFadden, J.) (expressing skepticism that "a declaration filled with hearsay statements from Montgomery—a condemned prisoner with a history of dishonesty—through an attorney who has been

admonished by another federal court for unprofessional conduct" "could justify the relief Montgomery seeks").

*Third*, the opinions of Montgomery's experts are conclusory about the relevant question and offer no insight into Montgomery's ability to understand the reasons for her execution. They opine that Montgomery is mentally ill, and recite that Montgomery's lawyers have said she is exhibiting symptoms of mental illness. What matters, however, is not the kind of mental impairment that a prisoner may have, but its "downstream consequence." *Madison*, 139 S. Ct. at 729. Thus, a prisoner may have delusions or dementia that do not "interfere with the understanding that the Eighth Amendment requires." *Id.* at 729.

Even assuming that Montgomery has had dissociative episodes manifesting in things such as "auditory hallucination," "lapses of time," and uncertainty about "what is real," Dkt. 17, at 16, that does not mean that she is, as the district court erroneously credited her experts with establishing, "so divorced from reality that she cannot rationally understand the government's rationale for her execution," *id.* at 18. Montgomery's recent medical records do not suggest that she is presently suffering from any symptoms of mental illness that would impair her ability to comprehend her legal situation or interact with her attorneys. Dkt. 13-3, at 3. Rather, Montgomery "understands her current legal situation, legal options, that she is going be executed, and that execution means death." *Id.*

In any event, the opinions of Montgomery's experts are contradicted by recent evidence reflecting Montgomery's ability to understand. As the district court acknowledged, the government presented "relevant contrary evidence," that Montgomery "understands that she is supposed to be executed soon." Dkt. 17, at 18. The court sought to minimize that evidence by suggesting it does not indicate "that she rationally understands the meaning and purpose of the punishment." *Id.* (quotation marks omitted). But her recent telephone conversations with family members squarely refute the district court's principal inference that she is fundamentally "divorced from reality"—much less from matters reflecting on the rationale for her punishment.

Montgomery is acutely aware of various legal challenges she has brought, discussing such things as her approval of representation by additional counsel who are "doing it for free" (Dec. 14), legal claims of hers that were still outstanding (Jan. 2), and her petition for clemency or a reprieve (Jan. 2). Dkt. 13-6, at 11, 13, 14-16. She is following political developments that could affect her case, telling her sister that she is keeping track of the days remaining until January 20 (Dec. 14). *Id.* at 12; *see id.* at 1 (Aug. 6) ("if Biden becomes president he said . . . he'll abolish the death penalty"). She is aware that she would be a rare example of a woman executed by the federal government (Sept. 1). *Id.* at 6. And she is aware that her execution will mean that she will have final calls with some members of her family and that others will be witnesses (Jan. 2), and further that she will need to be cremated, which she found "really helpful" to discuss with the prison chaplain (Dec. 14). *Id.* at 12, 15.

Moreover, contrary to the district court's conclusion, Montgomery's telephone calls do indicate that she understands that she is being punished for her crime. She understands that she has a criminal "sentence" for "[o]ne big" charge (Aug. 13) and is subject to "the death penalty" (Aug. 6). *Id.* at 1, 2. She acknowledged it is "true" that she "went off the path for a minute" (Dec. 17). *Id.* at 13. She marked the recent anniversaries of her crime and her arrest (Dec. 14, 17). *Id.* at 12, 13. She took comfort from Psalm 107:14, because it says God will burst the bonds of those in "the shadow of death" (Nov. 2). *Id.* at 7. And she is aware of the connections between crime and punishment, as she noted that her ex-husband would be "going down for a long time" because of the evidence against him in a new criminal case (Nov. 10). *Id.* at 8. Although she further suggested to her daughter that she is less culpable than her ex-husband because she "did not know what [she] was doing" when she committed her crime (Nov. 26), *id.* at 10, that defense was discredited at trial. *Montgomery*, 635 F.3d at 1083-85.

If anything, the government's evidence about Montgomery's understanding speaks *more* directly to the material question under *Ford*—whether she understands the rationale for her punishment—than does her generic evidence about potential dissociative episodes. She clearly does not misunderstand what a death sentence means, nor does she believe that the government is punishing her for a reason unrelated to her crime.

The district court effectively placed the burden on the government to address Montgomery's understanding of punishment directly, even when her own experts did

so in only conclusory terms, and when her daily psychology records belie any symptoms of psychosis. Dkt. 13-4. But the fact that she prevented the government (and her own experts) from gathering even more specific evidence about this question by waiting until the last minute to file her claim does not mean that she has made a substantial threshold showing that entitles her to a hearing. She has not.[4]

## CONCLUSION

For the reasons stated above, this Court should vacate the district court's stay of Montgomery's execution.

Respectfully submitted,

JOHN CHILDRESS
Acting United States Attorney

*/s/ J. Benton Hurst*
J. BENTON HURST
BRIAN P. CASEY
Special Assistant United States Attorneys

Charles Evans Whittaker Courthouse
400 East 9th Street, Fifth Floor
Kansas City, Missouri 64106
Telephone: (816) 426-3122)
Fax: (816) 426-3126
John.Hurst@usdoj.gov

[4] Having found that Montgomery has made a threshold showing and is entitled to a hearing, the district court did not address her derivative claim that she has been deprived of due process because her expert witnesses were unable to travel during the COVID-19 pandemic to conduct in-person examinations of her. But that claim, too, lacks merit, because BOP would have made Montgomery available for either in-person or remote examinations; her experts never sought to conduct either (or find other experts who would).

## CERTIFICATE OF COMPLIANCE

1. This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(a) because it contains 5,191 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

2. This motion complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (a)(6) because it has been prepared in a proportionally spaced 14-point typeface using Microsoft Word for Office 365.

/s/ *J. Benton Hurst*
J. Benton Hurst
Special Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Kelley J. Henry
Amy D. Harwell
Office of the Federal Public Defender
810 Broadway
Suite 200
Nashville, TN 37203

Lisa Nouri
2526 Holmes St.
Kansas City, MO 64108

*Attorneys for Petitioner-Appellant*

/s/ *J. Benton Hurst*
J. Benton Hurst
Special Assistant United States Attorney

# ADDENDUM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| LISA MARIE MONTGOMERY,<br><br>Petitioner,<br><br>v.<br><br>WARDEN OF USP TERRE HAUTE, IN, et al.<br><br>Respondents. | No. 2:21-cv-00020-JPH-DLP |

**ORDER GRANTING MOTION TO STAY EXECUTION PENDING A COMPETENCE HEARING**

Petitioner Lisa Montgomery is scheduled to be executed tomorrow, January 12, 2021, at the United States Penitentiary in Terre Haute, Indiana (USP – Terre Haute). Ms. Montgomery has filed a petition for writ of habeas corpus pursuant to 18 U.S.C. § 2241, alleging that she is incompetent to be executed under *Ford v. Wainwright*, 477 U.S. 399 (1986), and a motion to stay execution. Dkt. 1; dkt. 12. For the reasons that follow, the motion to stay is **GRANTED**.

## I. INTRODUCTION

In 2007, a jury convicted Ms. Montgomery of kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1). After hearing additional evidence at the sentencing phase of the trial, the jury found that the government had proven aggravating factors that warranted imposition of the death penalty, including that Ms. Montgomery committed the offense in an especially heinous or depraved manner. Ms. Montgomery raised her mental state as a defense at trial and as a

basis for relief in post-conviction proceedings. The verdict and sentence imposed were upheld both on appeal and during post-conviction relief proceedings.

In this case, Ms. Montgomery does not further challenge the validity of the conviction or sentence imposed. Rather, the sole issue presented is whether the government may lawfully execute Ms. Montgomery in her current mental state. Ms. Montgomery's counsel contend that executing her would be unconstitutional because her current mental state makes her unable to understand why the government seeks to execute her. They ask the Court to stay the execution so that the Court can hold a hearing and make findings about Ms. Montgomery's current mental condition based on a fully developed record.

In support of her motion to stay, Ms. Montgomery presents evidence from three expert witnesses who have each either treated Ms. Montgomery or interviewed her on multiple occasions. They all discuss Ms. Montgomery's history of mental illness, the specific diagnoses and corresponding treatments, and their discussions with Ms. Montgomery's counsel regarding her recent behavior. They all conclude that Ms. Montgomery's perception of reality is distorted and that she is currently unable to rationally understand the government's rationale for her execution. Based on this evidence, the Court finds that Ms. Montgomery has made a strong showing that she will be able to make the threshold showing of insanity that requires a hearing.

## II. BACKGROUND

### A. Ms. Montgomery's Crime and Procedural Background

The following is a summary of Ms. Montgomery's crime, adapted from the Eighth Circuit's factual recitation on direct appeal. *United States v. Montgomery*, 635 F.3d 1074, 1079–80 (8th Cir. 2011).

Ms. Montgomery met Bobbie Jo Stinnett at a dog show in April 2004. Ms. Montgomery learned through an online message board dedicated to breeding rat terriers that Ms. Stinnett was pregnant. Despite undergoing a sterilization procedure more than a decade earlier, Ms. Montgomery began telling friends and family in the spring of 2004 that she was pregnant.

On December 15, 2004, Ms. Montgomery, using an alias, contacted Ms. Stinnett, expressing interest in purchasing a puppy from Ms. Stinnett. Ms. Montgomery went to Ms. Stinnett's house, where she strangled her and, using a kitchen knife, cut and removed Ms. Stinnett's baby girl. Ms. Stinnett was eight months pregnant at the time of her murder.

Ms. Montgomery called her husband, who was unaware of her sterilization, and told him that she had gone into labor while Christmas shopping and had given birth at a women's clinic. They took the baby home. The following day, law enforcement officials went to their home to speak with Ms. Montgomery. She initially told officers that she had given birth at home, but upon further questioning at the sheriff's office confessed to killing Ms. Stinnett, removing the fetus from Ms. Stinnett's womb, and abducting the child. The baby, who was in good health, was returned to her father.

Ms. Montgomery was charged in the United States District Court for the Western District of Missouri with kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1). *Id.* at 1081. Ms. Montgomery asserted the defense of insanity. *Id.* at 1082. Defense experts alleged that Ms. Montgomery suffered from depression, borderline personality disorder, post-traumatic stress disorder (PTSD), and pseudocyesis, a condition in which a woman falsely believes she is pregnant, associated with objective physical signs of pregnancy. *Id.* In October 2007, a jury rejected the insanity defense, convicted Ms. Montgomery of first-degree murder, and sentenced her to death.

Ms. Montgomery's conviction and sentence were affirmed on direct appeal. *Id.* at 1099. The Supreme Court declined review. *Montgomery v. United States*, 565 U.S. 1263 (2012).

In March 2012, Ms. Montgomery moved to vacate her conviction and sentence pursuant to 28 U.S.C. § 2255. *United States v. Montgomery*, No. 4:12-cv-8001-GAF (W.D. Mo.). On March 3, 2017, the district court denied relief and denied a certificate of appealability on all claims. *Id.*, dkt. 212. The Eighth Circuit denied leave to appeal, *Montgomery v. United States*, No. 17-1716 (8th Cir. Jan. 25, 2019), and the Supreme Court denied certiorari, *Montgomery v. United States*, 140 S. Ct. 2820 (May 26, 2020) and *Montgomery v. United States*, 141 S. Ct. 199 (Mem) (Aug. 3, 2020) (denying rehearing).

On October 16, 2020, the government set Ms. Montgomery's execution date for December 8, 2020. *United States v. Montgomery*, No. 5:05-cr-6002, dkt. 444 (W.D. Mo.). On November 19, 2020, the District Court for the District

of Columbia stayed the execution until at least January 1, 2021. *Montgomery v. Barr*, No. 20-cv-3261, 2020 WL 6799140, at *11 (D.D.C. Nov. 19, 2020). On November 23, 2020, the government set a new execution date of January 12, 2021. *United States v. Montgomery*, No. 5:05-cr-6002, dkt. 445 (W.D. Mo.). In December, the District Court for the District of Columbia held that the new date was unlawfully set. *Montgomery v. Rosen*, 20-cv-3261, 2020 WL 7695994 (D.D.C. Dec. 24, 2020). But the District of Columbia Court of Appeals summarily reversed that order on January 1, 2021, *Montgomery v. Rosen*, No. 20-5379 (D.C. Cir. Jan. 1, 2021), so the January 12, 2021 execution date remains in effect.

Ms. Montgomery's counsel filed the petition in this case days ago, on Friday January 8, 2021, and filed a corresponding motion to stay the next day. Pursuant to the briefing schedule entered by the Court on the evening of January 8, the government filed a response on January 10 and Ms. Montgomery's counsel filed a reply today.

**B. Ms. Montgomery's History of Trauma and Mental Illness**

While Ms. Montgomery's current mental state is the issue in this case, her past trauma and diagnoses are relevant because her clinical history informs the experts' opinions regarding her current mental state.

Ms. Montgomery's childhood trauma was extreme and "consistent with torture." Dkt. 11-12 (Woods Decl. 2020). Her mother and stepfather were physically and emotionally abusive. Dkt. 11-5 at 42–43 (Porterfield Decl. 2016). Her mother found humor in the fact that Ms. Montgomery's first words as a

toddler were, "[d]on't spank me." *Id.* Her stepfather sexually assaulted her on a weekly basis for years. *Id.* at 43; *see also Montgomery*, 635 F.3d at 1080. Her mother's emotional abuse included sadistic acts such as taping Ms. Montgomery's mouth shut with duct tape for speaking and beating the family dog to death in front of Ms. Montgomery and her siblings. *Id.* at 43–44.

The prison psychiatrist who treated Ms. Montgomery in the three years preceding her trial diagnosed her with depression, bipolar disorder, and PTSD. Dkt. 11-10 at 2, 14–15. At trial, medical experts from both sides agreed that Ms. Montgomery suffered from depression, borderline personality disorder, and PTSD. *Montgomery*, 635 F.3d at 1082. One of Ms. Montgomery's experts, Dr. Logan, characterized Ms. Montgomery's illness as depressive disorder which "at times included psychotic features such as hallucinations." Dkt. 11-6 at 80 (Logan Report).

After her trial, Ms. Montgomery was placed at the Federal Medical Center, Carswell ("FMC Carswell"), a federal prison in Texas for female inmates with special mental health needs. Dr. Camille Kempke, Ms. Montgomery's treating psychiatrist at FMC Carswell between 2008 and 2010, witnessed Ms. Montgomery in "an acute dissociative psychotic state" at least twice. Dkt. 16-1 at ¶ 2–3. *Id.*

Two psychological experts hired by Ms. Montgomery's team in support of her § 2255 proceedings recounted the key role dissociation plays in Ms. Montgomery's mental functioning and provided declarations in support of the motion to stay in this action. Dr. Katherine Porterfield, who examined

Ms. Montgomery in 2016, is a clinical psychologist who has worked with survivors of torture and trauma for more than two decades. Dkt. 11-12 at 2 (Porterfield Decl. 2020); dkt. 11-5 at 39 (Porterfield Decl. 2016). In her opinion, Ms. Montgomery suffers from complex post-traumatic stress disorder[1] (CPTSD), complex partial seizures and brain impairment, depression, and bipolar disorder. Dkt. 11-12 at 2. Ms. Montgomery's "CPTSD is characterized by severe dissociative symptoms." *Id.* As Dr. Porterfield explained, "[d]issociation is a process of the human nervous system in which neurochemical reactions to excessive stress lead to alterations in consciousness and perceptions of senses, the environment, and the self. Dissociation represents a lowering of consciousness, *sometimes to the point of actual rupture of consciousness and awareness*." *Id.* at 2–3 (emphasis added).

Dr. Porterfield described the dissociative symptoms prevalent in Ms. Montgomery's functioning as follows: (1) confused thought process—"frequently confused thinking that indicated questions about the reality of certain events and perceptions in her past"; (2) disengagement—feeling "out of it" or as if she was in her own world and would forget what day it was or how she got places; (3) depersonalization—feeling detached from her own body or like she

---

[1] CPTSD is not a condition that is recognized by the Diagnostic and Statistical Manual of Mental Disorders. According to Dr. Porterfield, it is a "diagnostic category proposed for inclusion in the World Health Organization International Classification of Diseases, 11th version, and arrived at by consensus among a panel of international trauma experts." Dkt. 11-5 at 48. Because dissociative symptoms are included in the criteria for PTSD—which experts on both sides agree Ms. Montgomery has—the Court pays more attention to the symptoms described by Ms. Montgomery's experts rather than the diagnostic label of CPTSD or PTSD.

does not belong in her body; (4) derealization—feeling her surroundings are not familiar in some cases, not real; (5) identity dissociation—feeling like she has different people inside herself or like there are people inside who are talking to her; (6) memory disturbance—experiencing blank spells or loss of time; and (7) emotional constriction—having restricted or limited emotional experience. Dkt. 11-5 at 48–54.

Dr. George Woods, a physician with a specialty in neuropsychiatric consultations, conducted clinical evaluations of Ms. Montgomery, which included interviews and assessments of Ms. Montgomery's neurological status, in January and February 2013 and July and August 2016. Dkt. 11-6 at 1; dkt. 11-12 at 34. He observed that Ms. Montgomery has cerebellar[2] dysfunction and other brain impairments. Dkt. 11-6 at 5. Ms. Montgomery's symptoms consistent with impairment of the cerebellum include "distractibility, hyperactivity, impulsiveness, disinhibition, anxiety, irritability, ruminative and obsessive behaviors, dysphoria, and depression, tactile defensiveness and sensory overload, apathy, and childlike behavior." *Id.* Dr. Woods also diagnosed Ms. Montgomery with Bipolar I Disorder, Most Recent Episode Depressed, Severe with Psychotic Features." *Id.* at 19. Ms. Montgomery's brain impairments, exposure to extreme trauma, mood disorder, and psychosis "interact synergistically" preventing her from being able to act "rationally and logically." *Id.* at 24.

---

[2] As Dr. Woods explained, "The cerebellum is a region of the brain that plays an important role in motor control and some cognitive functions such as attention and language and in regulating fear and pleasure." *Id.*

According to Dr. Woods, prior to the announcement of her execution date, the symptoms of Ms. Montgomery's illnesses had largely been controlled at FMC Carswell, due to three interactive factors: "1) a highly structured and predictable environment; 2) a stable community wherein she is largely surrounded by supportive female companions and where her exposure to the threat of sexual violence is greatly reduced; and 3) careful titration and monitoring of her regime of antipsychotic medications." Dkt. 11-12 at 35. The impact of her medication, in particular Risperdal,[3] an antipsychotic medication, when combined with a supportive community allowed her to function more successfully but did not resolve her underlying conditions. *Id.* at 40.

**C. Ms. Montgomery's Current Mental Condition**

On October 16, 2020, the warden read Ms. Montgomery her execution warrant and she was removed from her community and activities and placed in a suicide cell. Dkt. 11-12 at 40–41. Dr. Woods believes that this disruption to her routine and the stress of learning of her impending execution have resulted in a resurgence of her symptoms. *Id.* at 35, 39.

Ms. Montgomery's attorneys have reported the following symptoms or behaviors:

- auditory hallucinations with self-attacking content (hearing her abusive mother's voice);

[3] Upon her arrival at FMC Carswell, Ms. Montgomery's medication regiment was modified "from a commonly used combination of mood stabilizer and anti-depressant to Risperdal, a medication used for its antipsychotic properties." Dkt. 11-6 at 18 (Woods Decl. 2013).

- sleep disturbances and nightmares of past sexual violence that are so disturbing she is unable to recount them;
- disruption in bodily functions related to elimination due to her perception of male guards' observation of her;
- distorted sense of reality (uncertainty about whether the infant she kidnapped is really her child; being unsure of what is real without access to her most trusted friend to confirm reality);
- religious delusions/hallucinations (believing God spoke with her through connect-the-dot puzzles, finding messages in a feather, seeing the moon in a location she found uncanny);
- gaps in consciousness of time passing due to periods of dissociating (staring blankly for prolonged periods without awareness, writing letters and then forgetting doing so);
- alterations in perception of the external world (feeling outside of herself as if she is "existing in a house in her mind");
- inappropriate affect, irritability, and emotional description; and
- distorted perceptions of reality evincing paranoia (believing a male psychologist stated to her, "Don't you just want to say 'fuck the government and kill yourself?'").

Dkt. 11-2 at 3–4; dkt. 16-1. Dr. Porterfield, Dr. Woods, and Dr. Kempke all testify that these behaviors indicate current psychosis. 11-12 at 3–4 (Dr. Porterfield: "manifestations of dissociation, disturbed thinking and likely psychosis"); *id.* at 39 (Dr. Woods: "a reemergence of psychotic symptomology" indicating that Ms. Montgomery has "lost contact with reality"); Dkt. 16-1 (Dr. Kempke: observations "indicate that Mrs. Montgomery is psychotic").

Based on reported observations, review of past materials, review of BOP medical records, and, in Dr. Kempke's case, her past observation of Ms. Montgomery experiencing psychosis, all three experts opine that Ms. Montgomery is presently unable to rationally understand the government's

rationale for her execution as required by *Ford*. Dkt. 11-12 at 4 (Dr. Porterfield), 41 (Dr. Woods); dkt. 16-1 at ¶ 17 (Dr. Kempke).

Neither Dr. Porterfield nor Dr. Woods has conducted an in-person evaluation of Ms. Montgomery since 2016 on account of the COVID-19 pandemic. Dkt. 11-12 at 3, 34. Both doctors acknowledge that an evaluation could be conducted by video. *Id.* at 4–5, 42. They express concern that their ability to detect Ms. Montgomery's psychiatric symptoms would be hindered by a video evaluation, especially since Ms. Montgomery's dissociative symptoms can be subtle and "often appear as absences, blank responses, silence, difficulty focusing, fatigue, attentional lapses and distractibility." *Id.* at 4–5, 42. Dr. Porterfield also expressed concern that "a remote evaluation of Mrs. Montgomery risks triggering her and leaving her in a compromised state that this evaluator would be unable to detect and properly address." *Id.* at 5.

The government disputes Dr. Woods and Dr. Porterfield's conclusion.[4] According to Dr. Christina Pietz, a forensic psychologist contracted by the U.S. Attorney's Office for the Western District of Missouri in anticipation of possible *Ford* litigation, "no professional evaluating competency should rely solely on [counsel-provided] information and historical clinical evaluations in making a determination as to current competency" because "competency (or incompetency) is a present-tense issue." Dkt. 13-3 at ¶ 16. Accordingly, Dr. Porterfield and Dr. Woods's "opinions as to current competency do not

[4] Dr. Kempke's declaration was filed with Ms. Montgomery's reply brief so the government did not have the opportunity to respond to it.

appear to have been based on sufficient, current facts or data to conform to any known professional standards for evaluating competency." *Id.* at ¶¶ 16–18. Dr. Pietz also notes that during the COVID-19 pandemic, she has conducted several mental competency evaluations remotely that she believes comports with professional standards. *Id.* at ¶ 9. Dr. Pietz opines that there is no "evidence that Mrs. Montgomery is suffering from a major mental illness that would impair her ability to comprehend her legal situation or interact with her attorneys." *Id.* at ¶ 12. Unlike Ms. Montgomery's experts, Dr. Pietz has never evaluated Ms. Montgomery in person. *Id.* at ¶ 8.

The government has also presented evidence contradicting Ms. Montgomery's allegation of present incompetency, including summary excerpts of BOP medical records, excerpts of transcripts of jail calls of Ms. Montgomery talking with family members and friends, and declarations by Dr. Pietz and Dr. Leslie Wheat, a BOP psychologist who serves as the Regional Psychology Services Administrator for the South Central Region. Dkts. 13-3; 13-4; 13-5; 13-6.

The government argues that the BOP medical records reflect a comprehension of her legal situation and impending execution. Dkt. 13-4 at ¶ 10 (summarizing interactions with BOP clinicians). Those records indicate that Ms. Montgomery reported feeling "great," positive, and hopeful about the future after her first execution date was vacated; reported sleeping poorly due to concern about the execution; and described not being forthcoming with BOP psychologists about her feelings on advice of her attorneys. *Id.*

In phone calls with relatives between August 6, 2020, and January 2, 2021, Ms. Montgomery discussed issues related to her crime and upcoming execution, including recalling the anniversary of her crime, discussing the possibility of her upcoming execution including plans for cremation, the delay of her execution due to her attorneys contracting COVID-19, and discussing her petition for clemency and other ongoing legal challenges. Dkt. 13-6.

## III. APPLICABLE LAW

### A. Standard for Stay of Execution

In deciding whether to stay an execution, the Court must consider: "(1) whether the stay applicant has made a strong showing that [s]he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). "The first two factors . . . are the most critical." *Id.* Before entering a stay, the Court must also consider "the extent to which the inmate has delayed unnecessarily in bringing the claim." *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004).

### B. Standards for Claim of Incompetence

Under *Ford v. Wainwright*, 477 U.S. 399 (1986), and its progeny, "[t]he Eighth Amendment . . . prohibits the execution of a prisoner whose mental illness prevents [her] from 'rationally understanding' why the State seeks to impose that punishment." *Madison v. Alabama*, 139 S. Ct. 718, 722 (2019) (quoting *Panetti v. Quarterman*, 551 U.S. 930, 959 (2007)). "A prisoner's awareness of the State's

rationale for an execution is not the same as a rational understanding of it. *Ford* does not foreclose inquiry into the latter." *Panetti*, 551 U.S. at 959. While doctors and other experts can help a judge understand the prisoner's cognitive defects, "the sole inquiry for the court remains whether the prisoner can rationally understand the reasons for his death sentence." *Madison*, 139 S. Ct. at 728.

Under *Ford*, Ms. Montgomery's burden is to make a substantial showing that her "mental illness prevents [her] from 'rational[ly] understanding' why the [government] seeks to [execute her]." *Madison*, 139 S. Ct. at 722 (quoting *Panetti*, 551 U.S. at 959). The question is whether her "concept of reality is so impaired that [she] cannot grasp the execution's meaning and purpose or the link between [her] crime and its punishment." *Id.* (quotation marks and citation omitted). The "standard focuses on whether a mental disorder has had a particular *effect*: an inability to rationally understand why the [government] is seeking execution." *Madison*, 139 S. Ct. at 728 (emphasis original). "As *Ford* and *Panetti* recognize, a delusional disorder can be of such severity—can 'so impair the prisoner's concept of reality'—that someone in its thrall will be unable 'to come to grips with' the punishment's meaning." *Madison*, 139 S. Ct. at 729 (quoting *Panetti*, 551 U.S. at 958). If Ms. Montgomery makes a "'substantial threshold showing of insanity' the protection afforded by procedural due process includes a 'fair hearing' in accord with fundamental fairness." *Panetti*, 551 U.S. at 949 (quoting *Ford*, 477 U.S. at 426, 424).

## IV. DISCUSSION

### A. Likelihood of Success on the Merits

Counsel argue that executing Ms. Montgomery without first providing the "fair hearing" required by *Ford* would violate her right to due process under the Fifth Amendment. To succeed on the Fifth Amendment claim, counsel must make a "'substantial threshold showing of insanity.'" *Panetti*, 551 U.S. at 950 (quoting *Ford*, 477 U.S. at 426). Counsel have made the required substantial threshold showing and, in doing so, demonstrated a strong likelihood of success on the Fifth Amendment claim.

Three experts—including Dr. Kempke, a retired BOP psychiatrist who treated Ms. Montgomery while she was in custody—have concluded that Ms. Montgomery's current mental state is so divorced from reality that she cannot rationally understand the government's rationale for her execution. Dkt. 16-1, at p. 2, ¶ 17 (Dr. Kempke); dkt. 11-2 at 4, ¶ 6 (Dr. Porterfield); *id.* at 41 (Dr. Woods).

The Court finds the experts' declarations reliable and sufficient to make the required threshold showing. The experts each relied on a combination of the relevant scientific literature, past direct observations of Ms. Montgomery, and descriptions of Ms. Montgomery's current behavior relayed by counsel. While the *Panetti* standard concerns the consequence, not the diagnoses of mental illness, *Madison*, 139 S. Ct. at 728, Ms. Montgomery's past conduct and diagnoses are relevant to assessing her current condition. *See Ferguson v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 1315, 1320 (11th Cir. 2013) ("[T]he history of [the petitioner's]

mental condition, the opinions of experts regarding it, and judicial decisions about it over the years are all relevant to a discussion of his present mental condition."). As discussed above, Dr. Woods has found that Ms. Montgomery has physical brain impairments, dkt. 11-6 at 5, and has diagnosed her with "Bipolar I Disorder, Most Recent Episode Depressed, Severe with Psychotic Features." *Id.* at 19. Dr. Porterfield found that Ms. Montgomery suffers from complex post-traumatic stress disorder (CPTSD), complex partial seizures and brain impairment, depression, and bipolar disorder. Dkt. 11-12 at 2. The prison psychiatrist who treated Ms. Montgomery in the three years preceding her trial diagnosed her with depression, bipolar disorder, and PTSD. Dkt. 11-10 at 2, 14−15. Ms. Montgomery's current behaviors are considered in this context.

Those current behaviors include, among other things, Ms. Montgomery

- experiencing auditory hallucinations;
- being unsure what is real;
- believing that a male psychologist stated to her, "Don't you just want to say 'fuck the government and kill yourself?'";
- expressing uncertainty about whether the infant she kidnapped is really her child;
- stating that God spoke with her through connect-the-dot puzzles;
- experiencing lapses of time, as evidenced by her staring blankly for prolonged periods; and
- reporting experiences of "feeling outside herself—as if watching from a distance."

*See* dkt. 11-2 at 3–4; dkt. 16-1.

While treating Ms. Montgomery in the past, Dr. Kempke personally observed her "in an acute dissociative psychotic state at least two times." Dkt. 16-1 at 1, ¶ 7. Dr. Kempke explains that many of Ms. Montgomery's behaviors indicate that she is again experiencing psychotic dissociation. *Id.* at 2, ¶¶ 14−17. Given Dr. Kempke's past direct observations of Ms. Montgomery experiencing a dissociative psychotic state, her opinions about Ms. Montgomery's current competencies are especially probative.

Dr. Kempke's conclusions are supported by those of Dr. Woods and Dr. Porterfield, both of whom have diagnosed Ms. Montgomery in the past. Dr. Woods opines that Ms. Montgomery's "grasp of reality has always been tenuous" and that her current symptoms indicate that she "is further disconnected from reality." Dkt. 11-12 at 41. Likewise, Dr. Porterfield opines that based on Ms. Montgomery's current behavior, in the context of past interactions, Ms. Montgomery's "concept of reality is [] impaired." *Id.* at 4, ¶ 6.

The respondent argues that none of Ms. Montgomery's experts' conclusions are reliable because they have not interviewed Ms. Montgomery in her current condition. But experts may rely on the statements of laypeople in forming opinions about Ms. Montgomery's mental state. *See*, *e.g.*, *United States v. Brownlee*, 744 F.3d 479, 481−82 (7th Cir. 2014) ("[A]n expert witness is permitted to rely on any evidence, whether it would be admissible or inadmissible if offered by a lay witness, that experts in the witness's area of expertise customarily rely on."). Indeed, each expert acknowledged that a direct interview would be useful for diagnosis, but that the descriptions of Ms. Montgomery's

current behavior, when coupled with their past treatment or evaluations, was sufficient to allow them to reach an opinion to a reasonable degree of scientific (or medical) certainty. Dkt. 11-12 at 4, ¶ 6; *id.* at 41; dkt. 16-1 at 2, ¶ 17.

The Court finds these experts' declarations satisfy the required preliminary showing that Ms. Montgomery's current mental state would bar her execution. *Ford* did not set a precise standard for competency, *Panetti*, 551 U.S. at 957, and the concept of "rational understanding" is hard to define. *Id.* at 959. While there similarly are no set criteria describing what constitutes a "substantial threshold showing," the record before the Court contains ample evidence that Ms. Montgomery's current mental state is so divorced from reality that she cannot rationally understand the government's rationale for her execution. Dkt. 16-1, at 2, ¶ 17 (Dr. Kempke); dkt. 11-2 at 4, ¶ 6 (Dr. Porterfield); *id.* at 41 (Dr. Woods). *See Panetti*, 551 U.S. at 950 (finding that petitioner had made substantial threshold showing); *see id.* at 970 (Thomas, J., dissenting) (noting that the majority found the "threshold showing" satisfied with one unsworn, one-page letter from a doctor and another one-page declaration from a law professor, both relying on the petitioner's past medical history).

The government presents relevant contrary evidence, including transcripts of Ms. Montgomery's recent phone conversations and reports from BOP staff observations. While this evidence certainly shows that Ms. Montgomery understands that she is supposed to be executed soon, it does not demonstrate that she rationally understands the "meaning and purpose of the punishment." *Madison,* 139 S. Ct. at 727. Moreover, "[a]s *Ford* and *Panetti* recognize, a

delusional disorder can be of such severity—can 'so impair the prisoner's concept of reality'—that someone in its thrall will be unable 'to come to grips with' the punishment's meaning." *Madison*, 139 S. Ct. at 729.

**B. Irreparable Injury**

Ms. Montgomery would be irreparably injured if the government executes her when she is not competent to be executed.

**C. Balancing Harms, Public Interest, and Equitable Concerns**

"'Both the [government] and the victims of crime have an important interest in the timely enforcement of a sentence.'" *Bucklew v. Precythe*, 139 S. Ct. 1112, 1133 (2019) (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)). It is also in the public interest to ensure that the government does not execute a prisoner who due to her mental condition "cannot appreciate the meaning of a community's judgment." *Madison,* 139 S. Ct. at 727. "[I]f the Constitution renders the fact or timing of his execution contingent upon establishment of a further fact, then that fact must be determined with the high regard for truth that befits a decision affecting the life or death of a human being." *Panetti*, 551 U.S. at 948–49. A hearing has not been held to determine Ms. Montgomery's competence. Because Ms. Montgomery has made "a substantial threshold showing of insanity," she is entitled to a fair hearing. *Ford*, 477 U.S. at 426.

The government's primary equitable argument is that counsel should have filed this claim and motion for stay sooner. Indeed, "last-minute filings that are frivolous and designed to delay executions can be dismissed in the regular course." *Panetti*, 551 U.S. at 946. But counsel's filing is not frivolous. As

discussed elsewhere in this order, Ms. Montgomery has been diagnosed with physical brain impairments and multiple mental illnesses, and three experts are of the opinion that, based on conduct and symptoms reported to them by counsel, Ms. Montgomery's perception of reality is currently distorted and impaired.

Additionally, the timing is not unreasonable given Ms. Montgomery's deterioration, this case's procedural history and what's at stake. Ms. Montgomery's condition began to devolve when the government first announced her execution date. But within a month, the execution was stayed. Counsel believed, and the District of Columbia District Court agreed, that the January 12 execution date was unlawful. Not until January 1, 2021, was the January 12 execution date relatively set in stone, and counsel filed this petition one week later. It is also worth noting that a brief stay of execution was initially granted to provide counsel time to recover from debilitating COVID-19 symptoms that included extreme fatigue, impaired thinking and judgment, and inability to concentrate. *See Montgomery v. Barr*, No. 20-3261 (D.D.C. Nov. 19, 2020), 2020 WL 6799140 at *7.

While the Court is mindful about the possibility of strategic litigation, neither that possibility or the delay outweigh the need for the stay when counsel has made a threshold showing that Ms. Montgomery is presently incompetent to be executed. *Madison,* 139 S. Ct. at 727 ("Similarly, *Ford* and *Panetti* stated that it 'offends humanity' to execute a person so wracked by mental illness that he cannot comprehend the 'meaning and purpose of the punishment.'").

## V. CONCLUSION

Ms. Montgomery's motion to stay execution, dkt. [12], is **GRANTED** to allow the Court to conduct a hearing to determine Ms. Montgomery's competence to be executed. The Court will set a time and date for the hearing in a separate order in due course.

**SO ORDERED.**

Date: 1/11/2021

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Brian Patrick Casey
U.S. ATTORNEY'S OFFICE
brian.casey@usdoj.gov

Amy D. Harwell
FEDERAL PUBLIC DEFENDER TNM
amy_harwell@fd.org

Kelley J. Henry
FEDERAL PUBLIC DEFENDER TNM
kelley_henry@fd.org

Lisa Nouri
lisanouri_atty@hotmail.com